EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Javier E. Lugo Montalvo<br><br>Recurrido<br><br>v.<br><br>Sol Meliá Vacation Club<br><br>Peticionario | Certiorari<br><br>2015 TSPR 159<br><br>194 DPR ____ |

Número del Caso: CC-2014-798

Fecha: 2 de diciembre de 2015

Tribunal de Apelaciones:

      Región Judicial de Fajardo, panel IX

Abogado del Peticionario:

      Lcdo. Christian E. Pagán Cordoliani

Abogado de la Parte Recurrida:

      Lcdo. Goodwin Aldarondo Jiménez

Materia: Procedimiento Civil – Doctrina del "Sham Affidavit" en mociones presentadas bajo la Regla 36 de Procedimiento Civil; sentencia sumaria.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Javier E. Lugo Montalvo

      Recurrido

         v.

                              CC-2014-0798

Sol Meliá Vacation Club

      Peticionario


Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.


En San Juan, Puerto Rico, a 2 de diciembre de 2015.

Nos corresponde determinar si erró el Tribunal de Primera Instancia y el Tribunal de Apelaciones al concluir que en este caso no procedía dictar sentencia sumaria puesto que existía una controversia de hechos materiales. Respondemos en la afirmativa. Además, el presente caso nos permite desarrollar en nuestra jurisdicción la doctrina del "sham affidavit" que adoptamos en SLG Zapata Berríos v. J.F. Montalvo Cash & Carry Inc., 189 DPR 414 (2013). También, nos brinda la oportunidad de aclarar un aspecto medular en la aplicación del requisito de nuestra Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36,

sobre la inexistencia de una controversia sustancial de hechos materiales.

I.

El Sr. Javier Lugo Montalvo presentó una querella en contra de su antiguo patrono Sol Meliá Vacation Club y Segunda Fase Corp., al amparo del procedimiento sumario que establece la Ley de Procedimiento Especial Sumario, Ley Núm. 2-1961, 32 LPRA sec. 3118 et seq., por alegado despido injustificado y discriminatorio por razón de su nacionalidad y edad. Como parte de su querella, específicamente, incluyó causas de acción bajo los preceptos de la Ley Núm. 80-1976, 29 LPRA sec. 185a et seq. y la Ley Núm. 100-1959, 29 LPRA sec. 146 et seq.

Esencialmente, el señor Lugo Montalvo sostuvo que comenzó a trabajar para Sol Meliá desde el 2005 en el puesto de Gerente de Mercadeo "Off Site". Asimismo aseveró que, para el mes de noviembre de 2010, el Sr. Carlos Guerrero de nacionalidad venezolana fue contratado para ocupar el puesto de Director Regional y pasó a ser su supervisor inmediato. Según el recurrido, a partir de su contratación, el señor Guerrero comenzó a realizar comentarios despectivos sobre la forma en que laboraba el personal de nacionalidad puertorriqueña de la empresa.[1] De igual forma, adujo que este lo despojó paulatinamente de sus funciones y deberes como Gerente de Mercadeo "Off Site" hasta que el 14 de enero de 2010 se produjo su despido.

---

[1] Cabe destacar que el recurrido nunca informó a Sol Meliá o a su personal sobre los alegados comentarios discriminatorios.

Afirmó, además, que luego de ser separado de su puesto, Sol Meliá empleó al Sr. José García, también de origen venezolano, para ocupar su posición.

En respuesta, Sol Meliá presentó oportunamente su contestación a la querella. Entre sus alegaciones responsivas expuso que el despido del señor Lugo Montalvo obedeció a una reestructuración que buscaba alcanzar la "costo-eficiencia" de los departamentos de la empresa, la cual conllevó la eliminación del puesto de Gerente de Mercadeo "Off Site" y el cierre del Departamento de Mercadeo. A base de eso, sostuvo que en la cesantía del señor Lugo Montalvo no medió ánimo discriminatorio, ya que la razón que motivó su destitución estuvo arraigada en una decisión que buscaba mejorar el funcionamiento de la compañía. Por otro lado, planteó que el señor García fue contratado para fungir en un puesto distinto al que había ocupado el señor Lugo Montalvo.

Tras varios incidentes procesales, que incluyeron la denegatoria de convertir el proceso a uno de carácter ordinario y la realización del descubrimiento de prueba, Sol Meliá presentó una moción de sentencia sumaria. En apoyo de su solicitud, hizo referencia a la deposición que le fue tomada al señor Lugo Montalvo donde este aseveró que los alegados comentarios discriminatorios del señor Guerrero eran de índole "personal" dirigidos a él y no hacia los puertorriqueños. A preguntas de la representación legal de Sol Meliá sobre los alegados comentarios discriminatorios, el señor Lugo Montalvo testificó:

P    Mi pregunta fue bien clara. Que yo le pregunté a usted qué comentarios hacía el señor Guerrero de manera despectiva criticando cómo los puertorriqueños trabajaban en el hotel.

R    Se me fue la palabra puertorriqueño… este… eh… pues, como le acabo de explicar, nada tiene que ver entonces ese tipo de comentario. **Ese tipo de comentario era un comentario hacia mi persona. No era hacia los puertorriqueños** y los otros comentarios eran al respecto –como le dije- que, pues, nos tenía que dar un curso porque nosotros aquí en Puerto Rico no sabíamos cómo hacer las cosas. Que no sabíamos negociar por teléfono; que cómo era posible; qué cómo íbamos a pagar trescientos dólares […]. (Énfasis suplido). Apéndice, pág. 69.

De igual modo, Sol Meliá señaló que el señor Lugo Montalvo admitió que su antiguo puesto y el del señor García no era el mismo. Así, durante la deposición, el recurrido declaró:

P    ¿Usted dijo que [al señor García] lo contrataron para trabajar en "in house marketing"?

R    Unjú.

P    Con la voz.

R    Sí.

P    Ese no era el puesto suyo, ¿verdad?

R    **No.** (Énfasis suplido). Apéndice, pág. 82.

Igualmente, Sol Meliá precisó que el señor Lugo Montalvo reconoció que, tras su despido, el Departamento de Mercadeo fue eliminado como resultado de un proceso de reestructuración:

P    ¿Hubo un cierre?

R    Sí.

P    ¿Sabe por qué fue el cierre?

R    Eh… **fue un cierre de operaciones completo.** Fue el final de la reestructuración donde decidieron cerrarlo todo y solamente dejaron –como le expliqué- o sea, como doce empleados. Cerraron "Telemarketing", cerraron todo, todo. Contabilidad creo que dejaron a una persona.

P    ¿Cerraron todo mercadeo?

R     No. **Mercadeo cerró tan pronto yo me fui.**
      (Énfasis suplido). <u>Apéndice</u>, pág. 59.

También, se resaltaron las siguientes expresiones del señor Lugo Montalvo sobre este particular:

P     ¿Cómo usted llega a ese entendimiento de que Carlos Guerrero ya no está trabajando para Sol Meliá?

R     Porque la compañía entera fue… o sea, **toda la empleomanía, o sea, la operación fue cerrada.** El funcionamiento de las unidades continúa, pero o sea, lo que queda es la gente del "front desk", "housekeeping". (Énfasis suplido). <u>Apéndice</u>, pág. 86.

Al mismo tiempo, Sol Meliá especificó en su moción que el señor Lugo Montalvo admitió que durante los años 2005, 2006 y 2007 el Departamento de Mercadeo había funcionado de manera excelente, pues tuvo la capacidad de atraer clientes prospectivos para el Departamento de Ventas y logró que el volumen de ventas para esos años sobrepasara las metas trazadas. Pero dijo que para los años 2008, 2009 y 2010, debido a la situación económica en Puerto Rico, no se consiguió que las ventas volvieran a sobrepasar las cuotas establecidas. <u>Apéndice</u>, pág. 47.

Sol Meliá también incluyó en su moción de sentencia sumaria una declaración jurada de la Sra. Frances Colón, su Consultora de Recursos Humanos. Hizo esto con la finalidad de sustentar, entre otras cosas, que la reestructuración de las operaciones respondió a altos costos operacionales sumados a una reducción en ventas, que una de las decisiones adoptadas para afrontar la merma en las ventas fue eliminar el puesto y el departamento donde se desempeñaba el señor Lugo Montalvo, lo que ahorró

$168,672.17 en gastos de nómina y que las funciones realizadas por el señor García como "Vacation Concierge Team Leader" no eran las mismas que llevaba a cabo el señor Lugo Montalvo como Gerente de Mercadeo "Off Site". Apéndice, págs. 258-259. Además, la moción de sentencia sumaria estuvo acompañada por la descripción de los puestos bajo discusión y otros documentos.

El 25 de junio de 2013, el señor Lugo Montalvo presentó su oposición a la moción de sentencia sumaria. Alegó la existencia de una controversia sustancial sobre los hechos relacionados al carácter discriminatorio de las actuaciones y los comentarios del señor Guerrero, las causas reales de su despido, la inexistencia del cierre del Departamento de Mercadeo tras su cesantía, la contratación de nuevo personal en los años subsiguientes a su destitución y la ausencia de distinción entre las funciones del puesto otorgado al señor García y el suyo.

Para lograr controvertir estos hechos, el señor Lugo Montalvo acompañó una declaración jurada suscrita por él, el 21 de junio de 2013, que contradecía sus contestaciones durante la deposición. Así, por primera vez, manifestó:

5. Que el Sr. Guerrero hizo comentarios despectivos sobre los puertorriqueños y su manera de trabajar. Incluyendo cuestionar y criticar la razón por la cual en Puerto Rico el día 6 de enero es un día festivo, donde nadie trabaja, mientras que en Estados Unidos es un día regular de trabajo.

7. El Sr. Guerrero se dirigía a mi persona gritando, de manera despectiva, denigrante y humillante, indicando que los puertorriqueños éramos vagos y lentos, que no sabíamos hacer

las cosas. Esto ocurría frente [a] empleados y clientes del Hotel.

8. El Sr. García fue contratado bajo el título de "Team Leader" del Aeropuerto. Sin embargo, el Sr. García realizaba las funciones que yo realizaba bajo el puesto de Gerente de Mercadeo y continuó con los proyectos de mercadeo de "Off Site" que yo creé y gestioné antes de mi despido, incluyendo el "booth" del aeropuerto.

16. Me consta que el Vacation Club continuó operando por cerca de dos (2) años luego de mi despido, no hubo el alegado cierre completo del Departamento de Mercadeo cuando yo me fui. Apéndice, págs. 328-329.

Mientras pendía la resolución de la moción de sentencia sumaria, el señor Lugo Montalvo desistió en corte abierta de su reclamación de discrimen por razón de edad. Asimismo, se tomó la deposición del Sr. Johann Tapia, Supervisor de Mercadeo "In-House" de Sol Meliá.

Entonces, el Tribunal de Primera Instancia denegó la moción de sentencia sumaria de la peticionaria. Entendió que existía controversia sobre ciertos hechos esenciales y materiales que ameritaban ser dilucidados en un juicio plenario. Específicamente, el Tribunal de Primera Instancia encontró como hechos en controversia los siguientes:

1. Las funciones del querellante al ser contratado y si hubo un cambio luego de entrar el nuevo supervisor, el señor Guerrero.
2. De haber cambios cuáles fueron las motivaciones de los cambios en funciones.
3. Si hubo discrimen por origen.
4. Si hubo comentarios despectivos en cuanto a la nacionalidad puertorriqueña.
5. Si se constituyó discrimen por origen.
6. Si hubo o no cierre de operaciones del Gran Meliá.
7. Si en efecto, se eliminó el Departamento de Mercadeo.

8. Si las funciones del Sr. José García contratado después del querellante, eran las mismas del querellante a pesar del cambio de nombre de puesto.
9. Si en efecto, se eliminó la plaza del querellante.
10. Si se siguió el procedimiento de la Ley de despido injustificado.
11. Si el despido fue uno justificado. Apéndice, pág. 386.

De la misma forma, el foro primario detalló una relación de los hechos sobre los cuales encontró que no existía controversia.[2] Consecuentemente, la peticionaria presentó una moción de reconsideración que fue denegada.

Inconforme con la determinación del foro primario, Sol Meliá acudió ante el Tribunal de Apelaciones mediante un recurso de certiorari. En su recurso, planteó que el foro primario erró al no eliminar la declaración jurada del señor Lugo Montalvo por constituir un "sham affidavit"; no tomar como hechos incontrovertidos aquellos derivados del testimonio del señor Tapia; y aplicar incorrectamente la Regla 36 de Procedimiento Civil, supra, al denegar la moción de sentencia sumaria. Por su parte, el señor Lugo Montalvo formuló su oposición al recurso.

Analizadas las posiciones de ambas partes, el foro apelativo confirmó la decisión del Tribunal de Primera Instancia. El Tribunal de Apelaciones encontró que el señor Lugo Montalvo estableció hechos en controversia, los cuales debían ser dilucidados por medio de un juicio plenario. Insatisfecha, Sol Meliá recurrió ante este Tribunal

---

[2] Un análisis de la resolución demuestra que el testimonio del señor Tapia, sometido mediante los suplementos de la parte peticionaria, no se mencionó en el dictamen del Tribunal de Primera Instancia.

mediante un recurso de certiorari en el que formuló los mismos errores planteados ante el Tribunal de Apelaciones. Oportunamente, el señor Lugo Montalvo presentó su oposición. Expedido el auto y con la comparecencia de ambas partes, procedemos a resolver.

II.

Lo primero que tenemos que determinar es si el Tribunal de Primera Instancia debió excluir la declaración jurada del señor Lugo Montalvo incluida como parte de su oposición a la moción de sentencia sumaria. Así, podremos precisar si realmente existe una controversia sustancial de hechos materiales que impida que se dicte sentencia sumaria en este caso.

### A. Doctrina del "Sham Affidavit"

El origen de la doctrina del "sham affidavit" se remonta a la decisión del Tribunal de Apelaciones de Estados Unidos para el Segundo Circuito en Perma Research and Development Company v. Singer Company, 410 F.2d 572 (2do Cir. 1969). Tras esta decisión del Segundo Circuito, todos los circuitos federales han considerado la aplicación de la doctrina y la han adoptado en alguna forma.[3]

---

[3] Véanse, por ejemplo, Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1er Cir. 1994); Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 706 (3er Cir. 1988); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4to Cir. 1984); Albertson v. T.J. Stevenson Co., 749 F.2d 223, 228 (5to Cir. 1984); Reid v. Sears Roebuck and Co., 790 F.2d 453, 460 (6to Cir. 1986); Darnell v. Target Stores, 16 F.3d 174, 176 (7mo Cir. 1994); Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1364-65 (8vo Cir. 1983); Radobenko v. Automated Equip. Corp., 520 F.2d 540, 544 (9no Cir. 1975); Franks v. Nimmo, 796 F.2d 1230, 1237 (10mo Cir. 1986); Van T. Junkins & Assocs. v. U.S. Indus. Inc., 736 F.2d 656, 657-59 (11mo

Recientemente, el Tribunal de Apelaciones de Estados Unidos para el Sexto Circuito, en McClain v. Mason Cnty., Ky., ___ Fed. Appx. ___, No. 14-5983, 2015 WL 3824957 (6to Cir. 2015), resumió los aspectos medulares de esta doctrina de la siguiente forma:

> This rule is grounded on the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists. Under the rule, a post-deposition affidavit such as McClain's declaration may be properly stricken by the district court for two reasons: first, if an affidavit directly contradicts the affiant's prior deposition testimony, it should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction. Second, when there is no direct contradiction, the district court should not strike or disregard that affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact issue. (Citas omitidas).

Del mismo modo, la mayoría de los estados que han abordado el tema han decidido adoptar una norma cónsona con la doctrina de elaboración federal.[4]

---

Cir. 1984); Sinskey v. Pharmacia Ophthalmics, Inc., 982 F.2d 494, 498 (Fed. Cir. 1992); Pyramid Sec. v. IB Resolution, Inc., 924 F.2d 1114, 1123 (D.C. Cir. 1991).

[4] Véanse, por ejemplo, Robinson v. Hank Roberts, Inc., 514 So.2d 958, 961 (Ala. 1987); Hancock v. Bureau of Nat'l Affairs, Inc., 645 A.2d 588, 590-591 (D.C. App. 1994); Tri-Cities Hosp. Auth. v. Sheats, 279 S.E.2d 210, 211 (Ga. 1981); Gaboury v. Ireland Rd. Grace Brethren, Inc., 446 N.E.2d 1310, 1314 (Ind. 1983); Lipsteuer v. CSX Transp., Inc., 37 S.W.3d 732, 735-736 (Ky. 2000); Zip Lube, Inc. v. Coastal Sav. Bank, 709 A.2d 733, 735 (Me. 1998); Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 541 n. 4 (Minn. 2001); Wright v. State, 577 So.2d 387, 390 (Miss. 1991); ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 388 (Mo. 1993); Delzer v. United Bank of Bismarck, 484 N.W.2d 502, 508 (N.D. 1992); Webster v. Sill, 675 P.2d 1170, 1172-73 (Utah 1983); Morris v. Smith, 837 P.2d 679, 684-85 (Wyo. 1992).

En SLG Zapata Berríos v. J.F. Montalvo Cash & Carry Inc., 189 DPR 414 (2013) tuvimos la oportunidad de aplicar la doctrina del "sham affidavit" ante un demandante que omitió, en sus respuestas durante una deposición, hechos materiales y esenciales a su causa de acción y luego los reveló, por primera vez, a través de una declaración jurada para oponerse a la solicitud de sentencia sumaria de la parte adversa. Íd., pág. 443. En aquella ocasión, aseveramos que permitir que una parte brinde una respuesta a medias en una deposición, reteniendo información, para luego presentarla de forma acomodaticia en la oposición a una moción de sentencia sumaria resulta contrario al objetivo que persigue la Regla 36 de Procedimiento Civil, supra. Íd., pág. 441. Subrayamos que no hay cabida en nuestro ordenamiento para estrategias dirigidas a prevalecer a toda costa sin referencia a la justicia. Íd., pág. 442. En consecuencia, adoptamos en nuestro ordenamiento la modalidad por omisión de la doctrina del "sham affidavit". Moll v. Telesector Res. Grp., Inc., 760 F.3d 198, 205 (2do Cir. 2014)("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").

Por su parte, hoy se nos plantea la doctrina del "sham affidavit" en su modalidad por contradicción. Esta aplica cuando: (1) una parte ha sido examinada mediante preguntas precisas y libres de ambigüedad y ha respondido en detalle durante una deposición o ha prestado previamente una

declaración clara e inequívoca bajo juramento; (2) al momento de oponerse a la solicitud de sentencia sumaria esa parte presenta una declaración posterior cuyo contenido es claramente incompatible con la versión ofrecida anteriormente; (3) la inconsistencia entre las dos declaraciones resulta evidente, manifiesta o patente, y no se trata de meras discrepancias de poca transcendencia o errores de buena fe; (4) no se ofrece explicación adecuada para la nueva versión; y (5) la declaración posterior no responde al descubrimiento de nueva evidencia, la cual a pesar de una diligencia razonable, no pudo descubrirse o no estuvo disponible al momento en que se prestó la declaración previa inconsistente. SLG Zapata Berríos v. J.F. Montalvo Cash & Carry Inc., supra, págs. 440-442; McClain v. Mason Cnty., Ky., supra.

Con respecto a los últimos dos requisitos, advertimos que el proponente de la declaración jurada podrá ofrecer una explicación adecuada para la nueva versión que, a satisfacción del foro juzgador, justifique la variación en el testimonio. Véase Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795 (1999) (donde se indicó que las partes pueden explicar o tratar de resolver las contradicciones con una explicación suficientemente razonable). Sin embargo, la explicación que brinde el proponente de la versión contradictoria no debe descansar en meras ambigüedades o planteamientos estereotipados, pues una parte que declaró bajo juramento tiene una carga considerable cuando pretende

deshacerse de una declaración previa. Véase <u>Pyramid Sec. v. IB Resolution, Inc.</u>, <u>supra</u>.

Esa explicación tiene que brindarse cuando se presenta la nueva declaración jurada contradictoria. Es en ese momento que el proponente, opositor a la solicitud de sentencia sumaria, tiene abiertas completamente las puertas del tribunal para demostrar que sus declaraciones incompatibles no son simuladas. Precisamente, ese es su *día en corte*. En esa instancia el tribunal habrá de considerar la suficiencia de las razones que justifiquen el cambio en la nueva versión ofrecida.

Un sistema que tenga verdaderamente como norte fomentar el acceso de sus ciudadanos a los foros judiciales y la búsqueda de soluciones justas, económicas y rápidas en los procedimientos legales no debe avalar el empleo de tácticas pérfidas de litigio que solo pretenden prolongar artificialmente la vida de casos inmeritorios. Así, al igual que la sentencia sumaria, la doctrina del *sham affidavit* es un valioso instrumento procesal que permite a los jueces limpiar la casa y descongestionar los calendarios judiciales. <u>Ramos Pérez v. Univisión</u>, 178 DPR 200, 220-221 (2010). Eso contribuye a la consecución del *verdadero acceso a la justicia*, pues se descargan los calendarios de los tribunales de reclamaciones sin méritos para darle paso a casos que realmente requieran la adjudicación de los derechos de las partes para hacer justicia. No hay justificación alguna para que un caso en el que no existen hechos materiales por dilucidar ocupe el

tiempo del tribunal en lugar de dedicarle ese día a otro caso donde sí es necesario un juicio en su fondo para presentar la prueba que permita dirimir los hechos relevantes y decidir lo que proceda en Derecho. Además, tampoco podemos consentir que litigantes se valgan de maniobras dilatorias con el mero propósito de retrasar innecesariamente un pleito como baraja de último recurso para forzar una negociación transaccional. En fin, no hallamos razón para que nuestros tribunales se abstengan de disponer de un caso por la vía sumaria cuando se presentan declaraciones juradas con el único propósito de crear controversias de hechos artificiales.

Al analizar detenidamente las declaraciones del señor Lugo Montalvo, la inconsistencia entre ambas es evidente y patente. Primero, en la deposición señaló que los comentarios del señor Guerrero no estaban dirigidos a los puertorriqueños y luego añadió que este expresaba que los puertorriqueños eran vagos y lentos. Segundo, se limitó a reconocer sin más que su puesto y el del Sr. García no era el mismo y después arguyó que las funciones eran de facto las mismas. Tercero, afirmó que, tras su cesantía de la empresa, el Departamento de Mercadeo fue cerrado, para posteriormente manifestar que no hubo tal cierre. Por último, no dudó en reconocer a secas el cierre operacional de Sol Meliá, aunque luego añadió que le *constaba* que continuó operando por cerca de dos años subsiguientes a su despido. Así pues, la declaración jurada posterior resulta

totalmente contraria al testimonio que brindó durante la toma de su deposición.

No nos encontramos ante discrepancias de poca trascendencia. Esas contradicciones tuvieron la consecuencia directa de crear una controversia simulada de hechos materiales que provocó que el Tribunal de Primaria Instancia se abstuviera de disponer de este caso al amparo de la Regla 36 de Procedimiento Civil, supra. No se desprende del expediente que el recurrido haya brindado alguna explicación para la nueva versión. Tampoco surge que la inconstancia sea producto del descubrimiento de nueva evidencia. El que la declaración jurada haya sido preparada tan solo cuatro días antes de presentar la oposición es un elemento indicativo adicional de que esta fue elaborada con la intención de crear una controversia artificial donde no la había.

Consistente con lo expuesto, concluimos que procedía excluir la declaración jurada del señor Lugo Montalvo al momento de evaluar la moción de sentencia sumaria. Ante las preguntas claras e inequívocas de la representación legal de Sol Meliá, el señor Lugo Montalvo brindó *su versión* de los hechos. No podemos permitir que esa versión sea variada con el propósito de crear una controversia simulada de hechos materiales que impida que se dicte sentencia sumaria. Por lo tanto, sostenemos que el foro primario erró al considerar la declaración jurada del señor Lugo Montalvo.

**B. Sentencia Sumaria**

En nuestro ordenamiento, el mecanismo de la sentencia sumaria está regido por la Regla 36 de Procedimiento Civil, supra, la cual desglosa los requisitos específicos con los que debe cumplir esta figura procesal. En esencia, para poder rendir una adjudicación en los méritos de forma sumaria es necesario que de las alegaciones, deposiciones, contestaciones a interrogatorios, admisiones, declaraciones juradas, y de cualquier otra evidencia ofrecida, surja que no existe controversia real y sustancial en cuanto a algún hecho material y que, como cuestión de derecho, proceda dictar sentencia sumaria a favor de la parte promovente. Regla 36.3(e) de Procedimiento Civil de 2009, 32 LPRA Ap. V R. 36.3(e). Véase, también, Oriental Bank & Trust v. Perapi S.E, Op. de 5 de noviembre de 2014, 2014 TSPR 133, pág. 20, 192 DPR ___ (2014). Es decir, la sentencia sumaria procede cuando **no existen controversias reales y sustanciales en cuanto hechos materiales**, por lo que lo único que queda es aplicar el Derecho. Meléndez González v. M. Cuebas, Inc. y Bohío International Corporation, Op. de 21 de mayo de 2015, 2015 TSPR 70, pág. 4, 193 DPR ___ (2015).

Hemos reiterado que la sentencia sumaria es un mecanismo procesal que provee nuestro ordenamiento para propiciar la solución justa, rápida y económica de controversias en las cuales resulta innecesario celebrar un juicio plenario. Nieves Díaz v. González Massas, 178 DPR 820, 847 (2010). La sentencia sumaria es un valioso instrumento procesal para descongestionar los calendarios

judiciales. Const. José Carro v. Mun. Dorado, 186 DPR 113, 128 (2012).

En este caso, el Tribunal de Primera Instancia denegó la solicitud de sentencia sumaria de la peticionaria por entender que su resolución requería la celebración de un juicio plenario, ya que existía controversia sobre ciertos hechos materiales. Sin embargo, de su resolución surgen cuatro controversias que fueron categorizadas como de hecho cuando en realidad estas son controversias de derecho. Nos referimos a las determinaciones de *hechos en controversia* número 3, 5, 10 y 11. El foro primario calificó como cuestiones de hecho las siguientes controversias jurídicas: si hubo discrimen por origen, si se constituyó discrimen por origen, si se siguió el procedimiento de la ley de despido injustificado y si el despido estaba justificado.

En ocasiones, establecer qué constituye una conclusión de derecho y cómo se diferencia de una determinación de hecho puede ser problemático. Sobre ese particular, hemos expresado que

> [c]ualquier deducción o inferencia de un hecho probado, que no represente una deducción o una inferencia de tal hecho, **sino que represente la aplicación de un principio de ley, de un razonamiento lógico o de una opinión jurídica al hecho probado**, o al hecho deducido o inferido del hecho probado, **se considerará una conclusión de derecho,[…]. (**Énfasis suplido). Sanabria v. Sucn. González, 82 DPR 885, 997 (1961).

Aunque a veces no es fácil atisbar la diferencia, es vital que los tribunales distingan puntualmente entre lo que es un hecho y una conclusión de derecho. Un "hecho" en

el campo jurídico es un acontecimiento o un comportamiento determinado y pertinente para la norma legal que se pretende aplicar. La norma jurídica se aplica al supuesto que constituye el "hecho" para arribar a determinada conclusión de derecho. En otras palabras, las determinaciones de hecho establecen qué fue lo que pasó, mientras que en las conclusiones de derecho se determina el significado jurídico de esos hechos conforme a determinada norma legal. Lo anterior, no es otra cosa que la teoría del silogismo jurídico, según la cual la decisión judicial es el resultado de la subsunción de unos hechos bajo una norma jurídica para llegar a una conclusión de derecho. Véase R. Meisel Lanner, El silogismo jurídico y la jurisprudencia constitucional, No. 11 Justicia Revista Jurídica Universidad Simón Bolívar págs. 83-101 (2006). Así, el silogismo jurídico "ubica al juez en un plano deductivo y argumental, en donde dentro de una estructura cerrada, la premisa mayor, le es dada por la norma por aplicar al caso, mientras la premisa menor es dada por el hecho relevante y la conclusión por la aplicación al caso sub-examine". Íd., pág. 94.

Ante una moción de sentencia sumaria, los jueces deben determinar primero cuáles son los hechos presentes, es decir, en qué conducta incurrieron las partes involucradas y las circunstancias que rodearon esas actuaciones.[5] Esos hechos, a su vez, deben ser interpretados por el juez para

---

[5] Para eso, el tribunal debe pasar juicio sobre la evidencia admisible que se le presente.

determinar si son esenciales y pertinentes, y si se encuentran controvertidos. De encontrarse presente algún hecho material en controversia no podrá utilizarse el mecanismo de la Regla 36 de Procedimiento Civil, supra. Por el contrario, de no existir tal controversia de hecho, el tribunal deberá dictar sentencia a favor del promovente de la solicitud de sentencia sumaria si el derecho le favorece a este último.

En todo caso debidamente instado ante un foro judicial habrá siempre una controversia de derecho presente y es precisamente esa controversia la que vienen los tribunales llamados a resolver. Si se comete el error de catalogar las controversias de derecho como controversias de hecho se eliminaría virtualmente el mecanismo de la sentencia sumaria de nuestro ordenamiento procesal, pues este requiere expresamente la inexistencia de una controversia de hechos materiales para que un tribunal pueda dictar sentencia de esa forma. Regla 36.3(e) de Procedimiento Civil, supra.

En casos como el que hoy atendemos, la determinación sobre si un despido fue justificado, si se siguió el procedimiento que requiere la legislación aplicable, o si hubo discrimen por origen constituyen las controversias de derecho que el recurrido ha colocado ante la consideración del foro judicial para determinarse con arreglo a la ley y a los hechos acontecidos. Por esta razón, las determinaciones de *hechos en controversia* número 3, 5, 10 y 11 fueron clasificadas erróneamente por el Tribunal de

Primera Instancia y deben tenerse por no puestas, pues en realidad son controversias de derecho.

Nos resta precisar si el resto de los hechos que el foro primario entendió estaban en controversia en efecto se encuentran controvertidos por la prueba en el expediente. Las determinaciones de *hechos en controversia* número 1, 2, 4, 6, 7, 8 y 9 giran, respectivamente, en torno a las funciones del recurrido al ser contratado y si luego de que el señor Guerrero comenzara en la empresa hubo un cambio en estas; de haber cambios cuáles fueron sus motivaciones; si hubo o no un cierre de operaciones en Sol Meliá; si en efecto, se eliminó el Departamento de Mercadeo; si las funciones del señor García, contratado después del señor Lugo Montalvo, eran las mismas a pesar del cambio de nombre de puesto; y si, efectivamente, se eliminó la plaza del señor Lugo Montalvo.

El expediente refleja que, en lo que concierne a la controversia número 1, durante la toma de su deposición el señor Lugo Montalvo afirmó que al comenzar a laborar con la peticionaria se le informó que ocuparía el puesto de Gerente de Mercadeo "Off Site" con la responsabilidad principal de alimentar la base de datos con potenciales clientes a través de eventos promocionales para que el Departamento de "Telemarketing" pudiera contactarlos e invitarlos a comprar "time-shares" de Sol Meliá. Asimismo, admitió que entre el periodo que comenzó en la compañía hasta el 2010 sus funciones "no cambiaron tanto". Apéndice, pág. 59.

Ahora bien, con respecto a la controversia número 2, el señor Lugo Montalvo aseveró que, tras la llegada del señor Guerrero, hubo cambios en su horario de oficina,[6] se cancelaron ciertos eventos promocionales y le asignaron nuevos proyectos promocionales.[7] No obstante, el señor Lugo Montalvo reconoció que las tareas para estos eventos estaban incluidas dentro de las funciones de su puesto.[8] Apéndice, págs. 75-76. De hecho, así se desprende de la descripción de su puesto anejada a la moción de sentencia sumaria. Apéndice, págs. 114-117.

En lo referente a la controversia número 4, el recurrido únicamente se limitó a mencionar que los alegados comentarios discriminatorios del señor Guerrero fueron a los efectos de que en Puerto Rico los empleados de Sol Meliá no sabían "cómo hacer las cosas" y conducir negociaciones telefónicas. Excluidos los comentarios presentados, por primera vez, a través de la declaración

_____

[6] El Tribunal de Primera Instancia determinó que era un hecho incontrovertido que el señor Guerrero notificó al recurrido que el horario del Departamento de Mercadeo iba a ser de lunes a viernes como medida de control de gastos.

[7] Por ejemplo, el señor Lugo Montalvo trabajó en promocionar a Sol Meliá en vuelos que partían de Venezuela a Miami, en establecer unas ofertas con Cabrera Auto y en instalar un exhibidor para el aeropuerto, entre otros proyectos. Igualmente, una serie de correos electrónicos anejados a la moción de sentencia sumaria demuestran que el señor Lugo Montalvo propuso la realización de un evento promocional en el Centro de Convenciones que le fue aprobado y por el cual fue felicitado por el señor Guerrero. Apéndice, pág. 385.

[8] El foro primario apreció, además, como hechos incontrovertidos que al señor Lugo Montalvo se le podían asignar distintas tareas a base de las necesidades operacionales del negocio, que el señor Guerrero y él discutían asuntos relacionados con ofertas promocionales de mercadeo para Sol Meliá y que este le manifestó al señor Guerrero su disponibilidad para llevar a cabo lo que fuera necesario.

jurada acomodaticia, no surge del expediente algún otro comentario de esta naturaleza.

En torno a las controversias número 6, 7 y 9, resaltamos nuevamente que el señor Lugo Montalvo aseguró que hubo un cierre total con motivo de una reestructuración y que se eliminó el Departamento de Mercadeo. De otra parte, el hecho de que la plaza del señor Lugo Montalvo fue eliminada se desprende claramente de la declaración jurada de la consultora de recursos humanos de Sol Meliá. Allí se indicó, bajo juramento, que entre las posiciones eliminadas debido a la reorganización de Sol Meliá estuvo la de Gerente de Mercadeo "Off Site" ocupada por el señor Lugo Montalvo.

Por último, el señor Lugo Montalvo reconoció expresamente que las funciones de su puesto y las del señor García no eran las mismas. Incluso, después de analizar las descripciones de ambos puestos anejadas a la moción de sentencia sumaria no tenemos duda de que no se trataba de la misma posición. Cabe resaltar que la posición ocupada por el señor Lugo Montalvo requería dieciocho calificaciones, conllevaba funciones de mayor discreción y devengaba un salario de aproximadamente $35,000 al año. En cambio, la posición del señor García exigía solo cinco calificaciones, acarreaba funciones de menor discreción y tenía una remuneración inferior, de $7.25 por hora, para un salario cercano a los $14,000 anuales. Apéndice, págs. 114-117.

III.

En vista de que la prueba testimonial y documental presentada en apoyo de la solicitud de la sentencia sumaria demuestra que realmente estos hechos no están en controversia, únicamente resta aplicar el Derecho.

**A. Ley Núm. 80**

En nuestra jurisdicción, una vez un trabajador ejerce una ocupación u ostenta un empleo, la Ley Núm. 80, supra, establece un esquema que regula su retención y despido. Ese esquema establece que "aquellos empleados de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) están contratados sin tiempo determinado; (2) reciben una remuneración, y (3) son despedidos de su cargo, sin que haya mediado una justa causa", tienen derecho al pago de una compensación por su patrono (además del sueldo devengado), típicamente denominada como la mesada. Orsini v. Srio de Hacienda, 177 DPR 596, 620-621 (2009). Sin embargo, amerita señalar que "[e]n Puerto Rico no existe una prohibición absoluta contra el despido de un empleado. Si existe justa causa este puede ser despedido". Santiago v. Kodak Caribbean, Ltd., 129 DPR 763, 775 (1992). Véase, también, Romero v. Cabrer Roig, 191 DPR 643, 651 (2014). Si no la hay, el remedio provisto es la imposición al patrono del pago de la mesada a favor del empleado. Feliciano Martes v. Sheraton, 182 DPR 368, 380 (2011). Así, la mesada constituye el remedio exclusivo disponible para los empleados despedidos injustificadamente, siempre que no

existan otras causas de acción al amparo de otras leyes que prohíban el despido y concedan otros remedios. Elba Torres Álvarez v. Centro de Patología Avanzada de Puerto Rico, Op. de 13 de octubre de 2015, 2015 TSPR 136, pág. 11, 193 DPR ___ (2015).

El Art. 2 de la Ley Núm. 80, 29 LPRA sec. 185b, establece una lista, no taxativa, de las circunstancias que constituyen "justa causa" para el despido de un empleado, seis de ellas atribuidas al empleado y tres al patrono. Pertinentes al caso ante nos, el referido artículo dispone que se entenderá como un despido justificado aquel que se acomete debido al cierre total, temporero o parcial de las operaciones del patrono y por cambios tecnológicos o de reorganización, así como los que se hacen necesarios por una reducción en el volumen de producción, ventas o ganancias que prevalecen al ocurrir el despido. Estos fundamentos contenidos en los incisos (d), (e) y (f) del Art. 2 de la Ley Núm. 80, Íd., "[e]stán relacionados a actuaciones del patrono dirigidas a la administración de su negocio, y principalmente se presentan por razones de índole económica que surgen según la operación diaria de la empresa". Díaz v. Wyndham Hotel Corp., 155 DPR 364, 376 (2001). "Se contemplan aquí situaciones que no son imputables al obrero pero que son de tal naturaleza que su despido resulta prácticamente inevitable dentro de las normas usuales y ordinarias que imperan en el manejo de los negocios[…]." Informe Conjunto, Comisiones de Trabajo y Derechos Civiles y Servicio Público, P. del S. 1112, 23 de

abril de 1975. Véase, además, Informe de la Cámara de Representantes, Comisión de Trabajo y Asuntos del Veterano, P. del S. 1112, de abril de 1976.

De este modo, la propia legislación protectora toma en consideración el que puedan surgir condiciones en la operación de los negocios que requieran cesantear personal sin que ello active el remedio de la mesada. No obstante, el mismo Art. 2 de la Ley Núm. 80, supra, dispone que no se calificará como un despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del negocio.

Ahora bien, el Art. 3 de la Ley Núm. 80, 29 LPRA sec. 185c, establece un orden de retención de empleados para las causales fundamentadas en el funcionamiento de la empresa. Bajo esta disposición, el patrono está obligado a dar preferencia a los empleados despedidos en caso de que dentro de los seis meses siguientes a su cesantía tuviere la necesidad de emplear a una persona en labores iguales a las que desempeñaba al momento de su despido y dentro de su clasificación ocupacional.

En el ámbito probatorio, si el trabajador demuestra que fue empleado en algún comercio, industria o negocio, que su contrato era por tiempo indeterminado, por el cual recibía remuneración y que fue despedido de su puesto e insta una causa de acción contra su patrono al amparo de la Ley Núm. 80, supra, se activa una presunción de que el despido fue injustificado. Rivera Figueroa v. The Fuller Brush Co., 180 DPR 894, 906-907 (2011). Como resultado, una

vez el trabajador presenta los hechos básicos, se invierte el orden de la prueba y el patrono viene obligado a demostrar esos hechos que dieron origen al despido y probar que este estuvo justificado para quedar eximido del pago de la mesada. Art. 11 de la Ley Núm. 80, 29 LPRA sec. 185k(a); Romero v. Cabrer Roig, supra, pág. 652. Por eso, el tribunal tiene que evaluar los hechos para determinar si existió justa causa para el despido. Jusino et als. v. Walgreens, 155 DPR 560, 572 (2001).

En este caso no hay controversia de que nos encontramos ante un despido en una compañía producto de una reducción en el volumen de ventas. Sol Meliá logró probar que el despido del señor Lugo Montalvo estuvo justificado. Se estableció que la merma en las ventas que atravesó Sol Meliá de 2009 a 2011 fue de tal magnitud que provocó una restructuración que no solo ocasionó el despido del señor Lugo Montalvo sino que, además, resultó en el cierre del Departamento de Mercadeo de la empresa y en la cesantía de todos sus empleados. Incluso, según admitió el señor Lugo Montalvo en su deposición, esa situación suscitó también el cierre del Departamento de "Telemarketing" y, eventualmente, la operación de Sol Meliá fue reducida a tal punto que únicamente permaneció el personal de "front desk" y "housekeeping".

Hemos reconocido que un patrono puede modificar su forma de hacer negocios a través de cambios dirigidos a optimizar sus recursos y aumentar sus ganancias, ya sea eliminando puestos, creando nuevas plazas o fusionando

posiciones ya existentes, como vehículo para enfrentar problemas de competitividad. Lo importante es que sea una reestructuración *bona fide*. Véase SLG Zapata Berríos v. J.F. Montalvo Cash & Carry Inc., supra, pág. 426. Queda claro que la situación que atravesó Sol Meliá y las decisiones administrativas que tomó cumplen con las exigencias de los incisos (d), (e) y (f) del Art. 2 de la Ley Núm. 80, supra. La situación económica de Sol Meliá, provocada por la reducción en ventas y el alto costo en las operaciones, la llevó a reorganizar sus operaciones en la Isla. Algunas de las estrategias implementadas como parte de sus esfuerzos de reestructuración redundaron en requerir que los empleados agotaran sus licencias de vacaciones,[9] eliminar las posiciones que se determinó no eran esenciales[10] y redistribuir sus funciones. Estos esfuerzos, según demuestra la prueba, redujeron los gastos operacionales en unos $168,672.17.

Por tanto, el despido del señor Lugo Montalvo se encuentra enmarcado dentro de un proceso *bona fide* de reorganización dirigido a paliar una baja en ventas. Así pues, Sol Meliá, según formulado en su moción de sentencia sumaria, rebatió la presunción en su contra y demostró que el despido del señor Lugo Montalvo estuvo justificado conforme a las disposiciones de la Ley Núm. 80, supra.

---

[9] Aparte del señor Lugo Montalvo, las empleadas Sra. Elida Peña y Sra. Verónica Rivera del Departamento de Mercadeo también tuvieron que utilizar sus licencias de vacaciones. Apéndice, pág. 254.

[10] El puesto de supervisora de ventas ocupado por la Sra. Elian Maestre fue eliminado antes de que el señor Lugo Montalvo fuera despedido. Apéndice, pág. 166.

Sobre las contenciones de que el señor García pasó a ocupar el mismo puesto del señor Lugo Montalvo, la evidencia no demuestra que se tratara en realidad del mismo puesto. Aunque el Art. 3 de la Ley Núm. 80, supra, impone la obligación de otorgar prioridad a los empleados cesanteados para ocupar plazas que surjan durante los seis meses posteriores a su despido, esta protección aplica ante nuevos puestos que requieran el desempeño de labores iguales y se encuentren en la misma clasificación ocupacional. Véase SLG Zapata Berríos v. J.F. Montalvo Cash & Carry Inc., supra, pág. 428. Destacamos, nuevamente, que las marcadas diferencias entre los requisitos, las funciones y la remuneración del señor García y el señor Lugo Montalvo no nos permiten concluir que se trata del mismo puesto, ni que gozaran de la misma clasificación ocupacional.

**B. Ley Núm. 100**

La génesis de la Ley Núm. 100, supra, respondió al elevado propósito de desarraigar la indeseable práctica social de muchos patronos de discriminar contra los empleados exclusivamente por razón de su edad, raza, color, sexo, origen social o nacional, condición social, ideas políticas o religiosas. Jusino et als. v. Walgreens, supra, pág. 574. En consecuencia, la Ley Núm. 100, supra, prohíbe y penaliza el discrimen en el empleo.

El Art. 3 de la Ley Núm. 100, 29 LPRA sec. 148, establece una presunción controvertible de discrimen que

favorece al empleado perteneciente a un grupo protegido por ley, que obliga al patrono a probar que el despido no fue discriminatorio cuando es realizado sin justa causa. La Ley Núm. 100, supra, no define el término "justa causa", por lo que hemos expresado que es necesario acudir a la definición que para dicho concepto provee la Ley Núm. 80, supra. Ramírez Ferrer v. Conagra Foods PR, 175 DPR 799, 814 (2009).

Para que la presunción de discrimen se active, el empleado demandante tiene que desfilar prueba capaz de crear en el juzgador de los hechos una base racional para poder inferir que la acción patronal se llevó a cabo por razones discriminatorias. Díaz v. Wyndham Hotel Corp., supra, pág. 388. Cónsono con lo anterior, en López Fantauzzi v. 100% Natural, 181 DPR 92, 124 (2011), reconocimos que, en toda causa de acción instada simultáneamente al amparo la Ley Núm. 80, supra, y la Ley Núm. 100, supra, el empleado, antes de articular su caso por la modalidad de discrimen que arguya, deberá demostrar que su despido fue uno injustificado.

En este caso, resulta suficiente que Sol Meliá haya establecido firmemente que el despido del señor Lugo Montalvo fue consecuencia de una reestructuración *bona fide* cobijada dentro de las causales de justa causa provistas por el Art. 2 de la Ley Núm. 80, supra. Sol Meliá derrotó la presunción en su contra y demostró, mediante preponderancia de la prueba, que la razón detrás del despido del señor Lugo Montalvo no respondió a

consideraciones discriminatorias. Por ende, no se configuró una causa de acción bajo la Ley Núm. 100, supra.

En vista de que el testimonio del señor Lugo Montalvo, en unión a la prueba documental anejada a la moción de sentencia sumaria, es suficiente para disponer del caso, no es necesario atender el segundo señalamiento de error de Sol Meliá en torno a la exclusión del testimonio del señor Tapia.

IV.

Por los fundamentos antes expuestos, revocamos el dictamen del Tribunal de Apelaciones y dictamos sentencia de manera sumaria a favor de la peticionaria desestimando la demanda del recurrido.

Se dictará Sentencia de conformidad.


Rafael L. Martínez Torres
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Javier E. Lugo Montalvo

    Recurrido

      v.

                                CC-2014-0798

Sol Meliá Vacation Club

    Peticionario

SENTENCIA

En San Juan, Puerto Rico, a 2 de diciembre de 2015.

Por los fundamentos antes expuestos, en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, revocamos el dictamen del Tribunal de Apelaciones y dictamos sentencia de manera sumaria a favor de la peticionaria desestimando la demanda del recurrido.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Estrella Martínez emitió una Opinión Disidente a la cual se unieron la Jueza Presidenta señora Fiol Matta, la Juez Asociada señora Rodríguez Rodríguez y la Jueza Asociada Oronoz Rodríguez. Además, la Juez Asociada señora Rodríguez Rodríguez hace constar la siguiente expresión: "Nuevamente, una mayoría de este Tribunal insiste en adoptar, indiscriminadamente, una norma incompatible con los principios que informan el mecanismo de sentencia sumaria en nuestro ordenamiento procesal civil. Al así proceder, se recurre, con un automatismo

indeliberado, a una figura para la cual los propios foros federales han demostrado cierto grado de aversión, así como divergencias de criterio en torno a su aplicación, utilidad y conveniencia. La sanción tan severa de excluir una declaración jurada presuntamente contradictoria que conlleva la doctrina del *sham affidavit* sitúa a la parte que se opone a la disposición sumaria de un pleito en una situación considerablemente desventajosa. En todo caso, la Regla 36.7 de las de Procedimiento Civil, 32 L.P.R.A. Ap. V, R. 36.7, provee para que el foro primario imponga sanciones monetarias a la parte que presente declaraciones juradas de mala fe o con propósitos dilatorios. En atención a estas consideraciones, me veo obligada a disentir del dictamen que hoy emite una mayoría y reafirmar mi displicencia y resistencia a la incorporación inopinada de la doctrina del *sham affidavit* en el Derecho Procesal Civil puertorriqueño".

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Javier E. Lugo Montalvo

 Recurrido

 Certiorari

  v.

Sol Meliá Vacation Club

 Peticionario

CC-2014-798

Opinión disidente emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ a la cual se unen la Jueza Presidenta señora FIOL MATTA, la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ y la Jueza Asociada ORONOZ RODRÍGUEZ

San Juan, Puerto Rico, a 2 de diciembre de 2015.

En SLG Zapata-Rivera v. J.F. Montalvo, 189 DPR 414 (2013) advertimos los peligros de la entrada por la cocina del automatismo en la aplicación de los requisitos dispuestos en la Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V. *Véanse* Opiniones Disidentes emitidas por la Jueza Presidenta señora Fiol Matta y el Juez Asociado señor Estrella Martínez en SLG Zapata-Rivera v. J.F. Montalvo, *supra*. Con la ampliación e incorporación de la doctrina de *sham affidavit* en la modalidad por contradicción, ahora se agrega a las Reglas de Procedimiento Civil el rigor desmedido, como criterio rector, por encima de la solución justa de las controversias.

I

Los hechos del caso ante nuestra consideración tienen su origen en una reclamación del Sr. Javier E. Lugo Montalvo (Lugo Montalvo) en la que sostiene que fue despedido injustificadamente y de forma discriminatoria de sus labores como Gerente de Mercadeo de Sol Meliá Vacation Club (Sol Meliá). A tales efectos, señaló que laboró para esa empresa desde el 2005 sin recibir ninguna amonestación ni incurrir en conducta impropia. Sostuvo que después que el Sr. Carlos Guerrero, de nacionalidad venezolana, comenzó a trabajar como Director Regional, éste empezó a criticar de manera despectiva la forma cómo los puertorriqueños trabajaban en el hotel. Asimismo, alegó que el señor Guerrero le despojó de funciones inherentes a su puesto, le asignó labores inferiores, y afectó la productividad del equipo al crear un ambiente que desmotivó a los empleados. A su vez, señaló que su plaza fue ocupada por el Sr. José García (García), quien es más joven y de nacionalidad venezolana. A base de ello, reclamó que fue despedido injustificadamente y discriminado por razón de edad y nacionalidad.

Por su parte, Sol Meliá negó las alegaciones de la querella y señaló que el despido del señor Lugo Montalvo obedeció a una reestructuración y proceso de reducción del personal. Igualmente, argumentó que el puesto que éste ocupaba fue eliminado, por lo que no fue sustituido por ninguna persona. Además, indicó que las funciones del

señor García eran distintas a las del señor Lugo Montalvo. Así, reclamó que el despido fue justificado.

Posteriormente, Sol Meliá presentó una *Moción Solicitando Sentencia Sumaria*. Por su parte, el señor Lugo Montalvo se opuso a ésta. Examinadas las posturas de las partes, el Tribunal de Primera Instancia emitió una Resolución el 14 de noviembre de 2013, archivada en autos el 3 de diciembre de 2013 en la que declaró no ha lugar a la solicitud de sentencia sumaria. El foro primario señaló varios hechos en controversia relacionados a las funciones que realizaba el señor Lugo Montalvo y las del señor García. Específicamente, determinó que existía controversia sobre los siguientes hechos: (1) las funciones que realizaba el señor Lugo Montalvo; (2) si hubo un cambio de estas funciones con el nuevo supervisor; (3) si las funciones del señor García eran las mismas que las del señor Lugo Montalvo; (4) si en efecto se eliminó el Departamento de Mercadeo; (5) si en efecto se eliminó la plaza del señor Lugo Montalvo; (6) si hubo o no un cierre de operaciones; y (7) si hubo comentarios despectivos en cuanto a la nacionalidad puertorriqueña.

Inconforme, Sol Meliá solicitó reconsideración de la Resolución emitida por el Tribunal de Primera Instancia. Ésta fue declarada no ha lugar, por lo que acudió ante el Tribunal de Apelaciones. Entre otras cosas, imputó que el foro primario erró al no dictar sentencia sumaria y al considerar la declaración jurada del señor Lugo Montalvo presentada en su oposición a la solicitud de sentencia

sumaria. Así las cosas, el foro apelativo intermedio emitió la Sentencia confirmatoria el 6 de agosto de 2014. En esencia, el Tribunal de Apelaciones entendió que existen controversias de hechos que deben ser dilucidadas en un juicio plenario. Específicamente, entendió que existen controversias que deben ser dirimidas por el foro primario con relación a las funciones que desempeñaba el señor Lugo Montalvo y el personal que lo sustituyó. Además, al identificarse un comentario o hecho que involucra ánimo discriminatorio, el foro apelativo intermedio entendió que resultaba importante considerarlo en la medida que el señor Lugo Montalvo alegó que fue sustituido de sus funciones por una persona de nacionalidad venezolana, por lo que resulta improcedente el mecanismo de sentencia sumaria.

En desacuerdo con la referida determinación, Sol Meliá acude ante este Tribunal y sostiene que procedía dictar la sentencia sumaria. En lo pertinente, alude que se debió eliminar la declaración jurada presentada por el señor Lugo Montalvo en su oposición a sentencia sumaria por entender que constituye una declaración realizada con el propósito de contradecir un testimonio suyo anterior para evitar que se dicte sentencia sumaria en su contra. La Mayoría de este Tribunal acoge tal postura al incorporar innecesariamente por *fiat* judicial la doctrina del *sham affidavit* en la modalidad por contradicción a las Reglas de Procedimiento Civil.

II

Como expuse desde SLG Zapata-Rivera v. J.F. Montalvo, *supra*, la figura del *sham affidavit* se importó innecesariamente a nuestra jurisdicción. Bajo esta doctrina se impide que una parte presente una declaración jurada para contradecir un testimonio anterior suyo, si lo hace con el único propósito de evitar que se dicte sentencia sumaria en su contra y sin explicar el porqué de la contradicción. Como advertí, el sólo hecho de que una declaración jurada ofrecida por una parte esté en conflicto con alguna deposición anterior, no es suficiente para que ésta sea rechazada. Kennet-Murray Corp. v. Bone, 622 F.2d 887 (5to Cir. 1980). Más aún, no toda declaración contradictoria constituye un engaño. De Luca v. Trustees of University Pennsylvania, 834 F.Supp.2d. 282 (E.D. Pa. 2011).

A diferencia de SLG Zapata-Rivera v. J.F. Montalvo, *supra*, y del caso ante nos, en la esfera federal, la doctrina se ha aplicado con prudencia y sólo en ciertas circunstancias. Ello, debido a que está en conflicto con un principio general de que los tribunales no debemos hacer determinaciones de credibilidad cuando concedemos o denegamos una solicitud de sentencia sumaria. Por tanto, se advierte que para aplicar la doctrina del *sham affidavit* los tribunales deben hacer una determinación real de que la contradicción es parte de un engaño. *Véanse* Yeager v. Bowlin, 693 F.3d 1076, 1080 (9no Cir. 2012); Hollins v. Delta Airlines, 238 F.3d 1255 (10mo. Cir.

2011); Croom v. Balkwill, 645 F.3d 1240 (11mo Cir. 2011); Palazzo rel. Delmage v. Corio, 232 F.3d 38 (2do Cir. 2000); Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 267 (9no Cir. 1991). De igual forma, tampoco se debe excluir la declaración jurada si ésta responde a evidencia que no era conocida o fue recordada posteriormente por el declarante, o cuando amplía o explica el testimonio ofrecido anteriormente. *Véanse* Lipsteuer v. CSX Transp., Inc., 37 S.W.3d 732 (2000); Adelman-Temblay v. Jewel Companies, Inc., 859 F.2d 517 (7mo. Cir. 1988). Así, resulta sumamente preocupante que tal determinación se realice automáticamente por el mero hecho de que los testimonios aparentan ser contradictorios sin brindar oportunidad alguna para que se justifique tal contradicción.

Hoy, la Mayoría de este Tribunal procede a extender el alcance de la norma del *sham affidavit*. A mi juicio, ello opera en detrimento a la doctrina firmemente establecida de que al determinar si procede la sentencia sumaria debe imperar la liberalidad a favor de la parte que se opone a ésta. Ramos Pérez v. Univisión, 178 DPR 200, 216-217 (2010); R. Hernández Colón, Práctica jurídica de Puerto Rico: derecho procesal civil, 5ta ed., San Juan, Ed. LexisNexis, 2010, pág. 277; J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, 2da. ed., San Juan, Publicaciones JTS, 2011, T. IV, pág. 1040. Máxime cuando la controversia tiene elementos subjetivos donde el factor credibilidad juega un papel esencial o decisivo para

llegar a la verdad, pues de lo contrario podemos despojar a un litigante de su día en corte sólo por el hecho de que la declaración jurada que presentó aparenta ser contradictoria sin tan siquiera oírle. *Véanse* Jusino *et als* v. Walgreens, 155 DPR 560, 579 (2001); Audiovisual Lang. v. Sist. Est. Natal Hnos., 144 DPR 563, 577-578 (1997); Soto v. Hotel Caribe Hilton, 137 DPR 294, 311 (1994). La conclusión de si la declaración jurada presentada responde al propósito de dar una versión simulada, ficticia o falsa de un hecho no debe ser realizada sumariamente. El hecho de que la parte que la presenta no explique las razones para la aparente contradicción que señala la parte contraria, no necesariamente implica que ésta se hizo con el propósito de engañar. Ello puede simplemente responder a que lo considere innecesario por entender que la declaración jurada que presentó se limita a complementar sus expresiones anteriores.

## III

En cuanto al caso de autos, no procedía dictar sentencia sumaria tanto al amparo del esquema vigente, así como bajo la norma que hoy acoge la Mayoría de este Tribunal. Veamos.

Es un hecho irrefutable que en la deposición el señor Lugo Montalvo, a preguntas sobre los comentarios discriminatorios, manifestó que el señor Guerrero utilizaba un lenguaje "verbal rudo", "un desdén hacia nosotros" haciendo expresiones de si estaban "locos" y

cuestionando "¿A qué ustedes se dedican?". A estos efectos, el señor Lugo Montalvo durante su deposición citó expresiones que el señor Guerrero hacía en contra de los puertorriqueños, tales como: "Dame el teléfono de ese lugar que yo lo voy a llamar. Ustedes no saben hacer negociaciones". Asimismo, el señor Lugo señaló que le entregaban los documentos al señor Guerrero por razón de que éste indicaba que "él tenía que enseñar cómo hacer negociaciones por teléfono; que nosotros no sabíamos". El señor Lugo Montalvo expresó en su deposición que "en todo momento era un rechazo a lo que nosotros estábamos haciendo y "que nosotros no sabíamos lo que estábamos haciendo". Además, indicó que para él esas expresiones eran discriminatorias e insultantes criticando de forma despectiva la manera en que los puertorriqueños trabajaban. Incluso, el señor Lugo Montalvo señaló que el señor Guerrero manifestaba "Dame el teléfono de esa persona que tú no sabes lo que estás haciendo. Ustedes aquí en Puerto Rico no saben lo que hacen", o "les voy a tener que dar un cursito de ventas por teléfono porque ustedes no saben negociar".[11]

A mi juicio, ello no resulta patente ni evidentemente contradictorio con la declaración jurada presentada posteriormente, en la cual indicó que el señor Guerrero manifestaba que los puertorriqueños eran vagos y lentos, que no sabían hacer las cosas, que no sabían ni

---

[11]*Véase* Apéndice, págs. 82-83, 86, 139, 141 líneas 11-17.

negociar algo por teléfono, que él iba a llamar para que aprendieran a hacer las cosas.

De igual forma, en cuanto a la contratación del señor García en sustitución del señor Lugo Montalvo, éste último manifestó durante la deposición que antes de los tres meses de su despido se empleó a un joven venezolano a trabajar en "in house marketing" y luego fue trasladado a una oficina en el aeropuerto, que las funciones del señor García tenían el mismo objetivo que las que él desempeñaba. Inclusive, indicó que le fue asignado el hacer unas presentaciones en el aeropuerto, las cuales continuó el señor García. Además señaló que el funcionamiento de las unidades del hotel continúa y presentó una lista de empleados contratados posterior a su despido.[12] Por tanto, tampoco resulta patente ni evidentemente contradictorio el que en la declaración jurada se indique que el señor García hacía las funciones del puesto de gerente de mercadeo que ocupaba el señor Lugo Montalvo y continuó con los proyectos que éste gestionó independientemente del título de su puesto.

Como consecuencia, al igual que los foros recurridos, aún bajo la doctrina innecesariamente incorporada, considero que existen hechos esenciales en controversia que impiden se dicte sentencia sumaria. En efecto, no está claro qué funciones realizaba el señor Lugo Montalvo; cómo éstas cambiaron durante el tiempo que éste laboró en la empresa; cuáles funciones ejerció el

---

[12] Íd., págs. 73-75,323-324,327.

señor García, y si, en efecto, éstas eran incompatibles con las realizadas por el señor Lugo Montalvo. De esta forma, desconocemos si realmente las funciones ejercidas por el reclamante fueron eliminadas o éste fue sustituido por el señor García para poder determinar si hubo o no un despido injustificado. De igual manera, desconocemos si su sustitución se debió a alguna razón discriminatoria por nacionalidad por razón de que el señor Guerrero entendiera que una persona de nacionalidad venezolana podía conseguir mejores negociaciones que el señor Lugo Montalvo.

IV

Por las razones expuestas, confirmaría al Tribunal de Apelaciones. El rigor desmedido, innecesariamente ampliado por la Mayoría de este Tribunal, no permitirá dirimir prudente y concienzudamente si una declaración jurada es el resultado de un engaño o falsedad cuyo propósito es evitar que se dicte sentencia a favor de otra parte. También, resulta en un menoscabo de la función judicial de conceder a las partes el derecho a que sus casos se diluciden en los méritos. La aplicación de la norma pautada a la controversia ante nos constituye evidencia de esa realidad. Así las cosas, me veo obligado a disentir del curso de acción de la Mayoría de este Tribunal.

Luis F. Estrella Martínez
Juez Asociado